IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

JOSEPH MICHAEL NOLAN,
*Appellant*.

No. 2 CA-CR 2025-0088
Filed July 23, 2026

---

Appeal from the Superior Court in Pima County
No. CR20223265003
The Honorable D. Douglas Metcalf, Judge

**AFFIRMED**

---

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Tanja K. Kelly, Assistant Attorney General, Tucson
*Counsel for Appellee*

Apfel Law Group, Phoenix
By Seth Apfel
*Counsel for Appellant*

**OPINION**

Presiding Judge Vásquez authored the opinion of the Court, in which Vice Chief Judge Eppich and Judge Kelly concurred.

V Á S Q U E Z, Presiding Judge:

**¶1**   After a jury trial, Joseph Nolan was convicted of first-degree murder, attempted armed robbery, attempted aggravated robbery, aggravated assault, and attempted first-degree murder. The trial court sentenced him to natural life in prison for first-degree murder, to be served concurrently with prison terms for the other offenses. On appeal, Nolan argues the court abused its discretion by finding that two former co-defendants could invoke their Fifth Amendment rights against self-incrimination, thus precluding Nolan from calling them as defense witnesses at trial. He also argues the state interfered with his ability to call one of the co-defendants as a witness by unreasonably delaying his post-conviction relief proceeding and by suggesting that the state could withdraw from the co-defendant's plea agreement based on inconsistent statements. For the following reasons, we affirm.

**Factual and Procedural Background**

**¶2**   We view the evidence in the light most favorable to upholding the convictions and resolve all reasonable inferences against the defendant. *State v. Duncan*, 257 Ariz. 360, ¶ 2 (App. 2024). One night in June 2022, Nolan and five others lured J.S. to a park in the Catalina area of Pima County to rob him under the guise of a drug transaction. The day before, Nolan's co-defendant, Paul Rodriguez, had contacted J.S., who sold THC vape pens, to arrange a meeting the next day. J.S. agreed and asked his friend, M.D., to drive him. Nolan and the others had arrived at the park before J.S. and hid behind a "treeline." On the way to the park, Nolan "had given everybody their weapons and masks." Four of the six, including Nolan, had firearms, and everyone except Rodriguez had masks or a shirt to cover their faces.

**¶3**   When J.S. and M.D. arrived at the park, J.S. opened the passenger door to meet with Rodriguez, who had approached the vehicle from the passenger side. M.D. testified that he did not have a weapon and that he never saw J.S. with one. It did not take long for J.S. to "finish up

what [he was] doing," before he told M.D., "[L]et's go."  M.D. stated that he then remembered his "car being damaged and hit with something that . . . felt like a bat."  The "windshield was breaking," and, when M.D. looked to his left, he saw that someone wearing a mask, later identified as Nolan, was trying to open his driver's side front door.  As M.D. sped away, he saw "people in the bushes," his "windows [we]re breaking, and [the vehicle was] being shot at."  After realizing that J.S. had been shot, M.D. called 9-1-1 and drove to a hospital.  A deputy with the Pima County Sherriff's Department (PCSD) responded to the 9-1-1 call and met M.D. and J.S. at the hospital, directing M.D. to the emergency entrance.  J.S. was later transferred to a different hospital, where he died from a single gunshot wound to the left side of his head.

¶4            The deputy testified that he had seen what appeared to be bullet holes in the glass and bullet strikes on the driver's side of M.D.'s vehicle.  There were eight bullet "impacts" on the driver's side and one on the rear passenger window of the exterior of the vehicle.  Eight of the nine impacts were consistent with .40-caliber bullets, and the other appeared to be of a smaller caliber.  During a search of the vehicle, detectives did not find any firearms, masks, or shell casings inside.  Another deputy responded to the park and found eight spent .40-caliber shell casings and a cell phone, later determined to be J.S.'s, on the ground.  Testing of the .40-caliber shell casings showed they were consistent with having been fired from the same "Glock brand of firearm."

¶5            During its investigation, PCSD obtained security camera footage of the park taken on the night of the incident.  After releasing video to the media, PCSD received anonymous tips "consistently" identifying Nolan, his brother Drake Nolan, Zachary Connor, and William Marley as four of the six individuals shown in the video.  About two months after the shooting, an attorney representing William Marley contacted PCSD about Marley's involvement and his willingness to "turn himself in" and be interviewed.  During one interview, and again at trial, Marley was shown the park surveillance video, and he identified Nolan and five others—Paul Rodriguez, Drake Nolan, Zachary Connor, Richard Miller, and himself— walking into the park before J.S. and M.D. had arrived.  In the video, Drake Nolan and Marley could be seen carrying shotguns.  Zachary Connor had a .22-caliber revolver, and Nolan was carrying a Glock .40-caliber handgun.  Marley testified that after the shooting Nolan took the guns and masks and told Marley to throw the clothes he was wearing in the trash.

**¶6**        On the same day that arrest warrants were being served, Nolan exchanged cell phone messages with the others about leaving the state—first going to Phoenix then to Mexico. Two of Nolan's co-defendants were arrested near the Mexican border, and Nolan was arrested as he was driving westbound on I-10, headed toward Phoenix. On cross-examination at trial, Nolan admitted that he "just wanted to run."

**¶7**        When he was arrested, Nolan had two cell phones that were confiscated and "turned in as evidence." A photo downloaded from one of the phones showed Nolan holding a firearm bearing the serial number ZUY183. Using the serial number, PCSD was able to determine that after the shooting, Nolan had given the gun to a friend who then sold it to a pawn shop where it was recovered by PCSD.

**¶8**        A grand jury indicted Nolan and the others for first-degree murder, armed robbery, aggravated robbery, aggravated assault, and attempted first-degree murder. Before trial, Nolan moved to dismiss the charges on the ground of prosecutorial misconduct or, alternatively, to preclude two potential defense witnesses from invoking their Fifth Amendment rights not to testify. The trial court denied the motion on both bases. After a fourteen-day jury trial, Nolan was convicted and sentenced as described above.[1] This appeal followed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

### Discussion

**Witnesses Invocation of Fifth Amendment**

**¶9**        Nolan argues the trial court erred by finding that two former co-defendants, Drake Nolan (Drake) and Zachary Connor, could invoke their Fifth Amendment rights against self-incrimination and thus precluding Nolan from calling them as witnesses at trial. We review for an abuse of discretion a court's decision to preclude the testimony of a witness intending to assert his Fifth Amendment privilege against self-incrimination. *State v. Champagne*, 247 Ariz. 116, ¶ 78 (2019).

---

[1]Nolan was the only defendant whose case went to trial. Zachary Connor, Drake Nolan, Richard Miller, and William Marley accepted plea agreements. As for Paul Rodriguez, the record shows he had contested competency proceedings under Rule 11, Ariz. R. Crim. P., still pending after Nolan's trial.

¶10        Before trial, Nolan moved to preclude Drake from invoking his Fifth Amendment right not to testify at trial. The motion was based on a letter written by Drake while in prison that had been mailed to his father and given to Nolan. In the letter, which began with "To Whom it May Concern," Drake claimed that he "did indeed see a firearm Barrel sticking out the window of the car" and that "what happened that night was purely self defense." Nolan argued that such evidence was "relevant and exculpatory to [his] justification defense with respect to the first-degree murder charge." Nolan's motion did not elaborate on Connor's potential testimony, only briefly referring to him as a co-defendant and "eyewitness[]." Nevertheless, after conferring with counsel, the trial court set a hearing to address "the invocation of the fifth amendment rights of Drake Nolan and Zachary Connor."

¶11        The trial court ultimately held two hearings on Nolan's motion.[2] At the first hearing, Nolan argued that if a gun was protruding out of the victim's vehicle and pointing at Nolan and the others, this "would not only be exculpatory, it would also be . . . [critical to Nolan's] self-defense claim." At the second hearing, Drake and Connor were present with counsel, who had been appointed by the court to advise them of their Fifth Amendment rights and the consequences of waiving them and testifying at trial. Drake and Connor were both in custody, serving prison sentences for their role in the offenses. Drake's counsel informed the court that Drake would "assert his Fifth Amendment" concerning any questions related to the incident and what had happened afterwards "up until his arrest," including "[t]he statement that he gave to the police." He would also assert the privilege as to "[h]ow that letter, the 'To Whom It May Concern' letter came about, and his writing it[, a]nd the interview by [Nolan's] private investigator" about the letter. When the court asked Drake if it was his intent to assert his Fifth Amendment rights, he answered, "Yes, Your Honor." Connor's attorney likewise informed the court that Connor "wish[ed] to invoke the Fifth Amendment, and he does think that things

_____

[2]Although both hearings addressed the same motion, the first hearing on December 12, 2024, primarily dealt with Nolan's claim that the case should be dismissed based on prosecutorial misconduct because the state had interfered with Nolan's ability to call Drake as a witness by threatening a perjury charge. We address that claim below. However, we refer to some comments made during the first hearing in this part of our discussion because they also relate to Nolan's request to preclude the witnesses from invoking their Fifth Amendment rights not to testify.

that he would be asked to testify to on the stand would incriminate him not in this matter, but in other matters." When asked by the court, Connor confirmed that it was his intent to assert his Fifth Amendment right against self-incrimination. The court ruled that Drake and Connor had properly invoked their Fifth Amendment rights not to testify at trial and denied Nolan's request to call them as witnesses.

¶12        Defendants have the right under the Sixth Amendment to call witnesses whose testimony would be "relevant and material to the defense" and, if necessary, to compel their attendance at trial. *Washington v. Texas*, 388 U.S. 14, 18-19 & 23 (1967). But even if such a showing has been made, the right to compel the attendance of witnesses is not absolute. *State v. Harrod*, 218 Ariz. 268, ¶ 20 (2008). If "the trial judge determines that a witness could legitimately refuse to answer essentially all relevant questions, then that witness may be totally excused without violating an individual's Sixth Amendment right to compulsory process." *State v. McDaniel*, 136 Ariz. 188, 194 (1983). Our supreme court has "emphasize[d], however, that this exception is a narrow one. It is only applicable when the trial judge has extensive knowledge of the case and rules that the Fifth Amendment would be properly invoked in response to all relevant questions that the party calling the witness plans on asking." *Id.*

¶13        Here, the trial court found that it had extensive knowledge of the case "based on the protracted hearings" it had presided over. The record supports that finding as the court had been assigned to the case for over a year before Nolan filed his motion and had conducted numerous hearings involving the defendants.[3] Nolan does not challenge this finding on appeal. However, he does challenge the court's ruling that Drake and Connor could refuse to answer all relevant questions. He argues that the court's determination required more than merely asking them if they intended to invoke the Fifth Amendment. According to Nolan, the court was also required to determine "what questions the parties intend to ask so as to ascertain whether all relevant questions provide a basis for invocation."

¶14        Nolan asserts that "both Drake and Connor . . . would testify that they saw a gun pointing from [M.D.'s vehicle]." And he contends that "it does not appear that there is any debate that their proposed testimony would have been material, relevant, and favorable to the defense." The

_____

[3]Notably, the trial court had presided over Drake's change of plea and sentencing hearings and Connor's change of plea hearing.

record supports Nolan's argument as to Drake but not as to Connor. At the first hearing on his motion, Nolan stated that he believed Connor would "testify consistent with" his self-defense claim but he was "not sure." Nolan had not "interviewed [Connor] and, as a matter of strategy, [had] not plann[ed] on interviewing him prior to trial." Thus, Nolan was merely speculating that Connor would support his defense. This is not sufficient. "[T]he Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor.*'" *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (emphasis in *Valenzuela-Bernal*) (quoting U.S. Const. amend. VI). Nolan was required to "at least make some plausible showing of how [Connor's] testimony would have been both material and favorable to his defense." *Id.* He has thus failed to "establish a violation of his constitutional right to compulsory process merely by showing" that the trial court precluded him from calling Connor as a witness. *Id.* The court therefore did not abuse its discretion by ruling that Connor had properly invoked his Fifth Amendment right not to testify.[4] *See Champagne*, 247 Ariz. 116, ¶ 78.

¶15        At the same hearing, Nolan referred to Drake's "To Whom it May Concern" letter, which Nolan asserted "indicated that the incident involved self-defense" because Drake had seen "a firearm barrel sticking out of the window of the car . . . prior to the shooting." We agree that such testimony would corroborate Nolan's trial testimony and that, as Nolan argued below, it would be essential to his self-defense claim. Nolan therefore met the threshold requirement of showing that Drake's testimony "would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867. But this does not resolve the issue. "If upon conducting an in camera hearing the trial judge determines that a witness could legitimately refuse to answer essentially all relevant questions, then that witness may be totally excused without violating an individual's Sixth Amendment right to compulsory process." *McDaniel*, 136 Ariz. at 194.

¶16        Nolan points out that "[t]he trial court did not conduct an in camera examination and only questioned the witnesses (including Drake's counsel) about whether they would invoke, not what questions could be asked versus what could not be asked." He maintains the court did not

---

[4]Having made this determination, our remaining discussion focuses exclusively on Drake's invocation.

consider whether Drake could provide relevant testimony without "crossing the boundary into self-incrimination" and thus "lacked a sufficient basis to determine whether Drake . . . could invoke as to all relevant questions." First, we reject the notion that the court was required to conduct an in-camera examination to make a proper determination. A trial court is not required "to personally question the witness, conduct a hearing, or allow counsel to call the witness to the stand if the court possesses 'extensive knowledge of the case' such that it can find that the witness can legitimately invoke the Fifth Amendment to all relevant questions asked." *Harrod*, 218 Ariz. 268, ¶ 21.

¶17        We also disagree that the trial court failed to properly consider whether Drake could testify as to all relevant questions without incriminating himself. Nolan has never wavered, in the trial court or on appeal, about the narrow scope of Drake's relevant and material testimony. Drake "would testify that [he] saw a gun pointing from [M.D.'s vehicle]." But the court stated that it had "a hard time believing that there could be any questions asked of Drake with respect to the upcoming trial with [Nolan] that he wouldn't be able to take the Fifth." The court noted that "[t]here is no room between what he would testify to and what would put him in jeopardy." And the court expressly ruled that "the Fifth Amendment would be properly invoked in response to all relevant questions that the party calling Drake Nolan plans on asking."

¶18        At the second hearing, the trial court also specifically asked Drake's counsel: "[I]s there anything that could be asked of your client at trial that would not put your client in jeopardy?" She responded that "hypothetically, if . . . Nolan decided to take the witness stand, and if it meets the criteria . . . on consistent statements, if the Court found that Drake's statement to the police that [Nolan] said something about seeing a gun, perhaps they could call him for that purpose." Based on her response, the court suggested that "Drake [could be] held in the Pima County Jail until the trial was over, and if [Nolan] testified, we could re-urge this issue." Drake's counsel responded: "He's not happy about it, but yeah, that's a resolution to it." The court then ordered "that Drake be held in the Pima County Jail until the end of [Nolan's] trial." It stated that "[s]hould the circumstances change during the trial that may raise a new issue under the Fifth Amendment, he'll be available and can be called over here to testify if need be."

¶19        Nolan did testify at trial. He stated that after M.D. and J.S. had arrived at the park, he watched from a distance while Paul Rodriguez

and Drake spoke with J.S. who had exited the vehicle. Nolan heard arguing and saw J.S. "quickly get back into the car." He then saw Drake and Rodriguez running as "the car started doing a U-turn . . . going pretty fast." Nolan stated that he had "heard the engine roaring and dirt and rocks were getting kicked everywhere." "[A]fter the car had completed the U-turn" and "slowed down a lot," the next thing Nolan saw was an open driver's side door with a "high-caliber rifle" being pointed at Drake and him. Nolan testified that he then started firing his weapon at the vehicle.

¶20 With Nolan's trial testimony, the "hypothetical" posed by Drake's counsel for calling Drake as a witness actually played out—Nolan did take the witness stand, he testified that he saw a gun and began firing, and "Drake's statement to the police that [Nolan] said something about seeing a gun" was consistent with Nolan's testimony. But when Nolan finished testifying, and the trial court asked if the defense had any additional witnesses, Nolan responded, "No." Nolan and the state both rested their cases. The court then ruled: "[N]ow that the testimony is completed," Drake is ordered "back to the Department of Corrections."

¶21 Nolan's trial testimony provided an additional opportunity for him to re-urge Drake's Fifth Amendment invocation and Nolan's ability to call him as a witness, but Nolan failed to take advantage of it despite the trial court's order permitting him to do so. *Compare State v. Anthony*, 218 Ariz. 439, ¶ 38 (2008) ("[W]here a motion in limine is made and ruled upon, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial." (alteration in *Anthony*) (quoting *State v. Burton*, 144 Ariz. 248, 250 (1985))), *with State v. Lujan*, 136 Ariz. 326, 328 (1983) (when court does not rule on motion in limine, motion does not preserve defendant's objection if he fails to raise issue at trial).

¶22 Nolan also argues the trial court erred by precluding Drake's testimony because he did not have "reasonable grounds to apprehend danger" of prosecution from his testimony and he had also entered into a plea agreement expressly waiving his right to invoke. "To invoke the right not to incriminate [oneself], . . . the danger of prosecution must be 'real and appreciable' and not 'imaginary and unsubstantial.'" *State v. Verdugo*, 124 Ariz. 91, 92 (1979) (quoting *Brown v. Walker*, 161 U.S. 591, 599 (1896)). Nolan acknowledges that Drake's post-conviction relief proceedings were pending at the time of his trial, and he recognizes that "[t]he right to invoke generally persists during post-conviction relief proceedings." *See State v. Rosas-Hernandez*, 202 Ariz. 212, ¶¶ 14, 16 (App. 2002). But Nolan maintains that Drake "did not raise a challenge to his underlying conviction, only a

sentencing issue was raised," which "involv[ed] an argument that trial counsel was ineffective for failing to object to a passing statement . . . by the victim's next of kin." Nolan characterizes the issue as "rather frivolous." He claims that because Drake's petition was denied a month after Nolan's trial was complete, "there does not appear to be any sound reason that the trial court could not have resolved post-conviction relief prior to the trial."

¶23        First, nothing in the record supports Nolan's characterization of Drake's post-conviction relief issue as frivolous or his claim that it should have been resolved sooner. Regardless of the outcome, Drake's right to challenge his sentence is in no way inferior to Nolan's right to call witnesses at a jury trial. And we are aware of no authority that requires a trial court to resolve one defendant's case more quickly based on another defendant's desire to call him as a witness at trial. "[A] witness may not be compelled to testify until after sentencing and the time for appeal as of right has expired." *Verdugo*, 124 Ariz. at 92. This includes, as in Drake's case, "the time period in which a timely initial petition for post-conviction relief may be filed." *Rosas-Hernandez*, 202 Ariz. 212, ¶ 16. Because Drake's initial post-conviction relief proceeding was pending throughout Nolan's trial, the court did not err in denying Nolan's motion on this basis.

¶24        The record also does not support Nolan's argument that "Drake had no reasonable ground to apprehend danger by testifying" because "there was no real possibility of a perjury charge or plea withdrawal." Nolan cites the state's concession that the potential for perjury was "marginal." But that concession was made at the first hearing on Nolan's motion. At the second hearing, Drake's attorney indicated that she was concerned with potential inconsistencies between Drake's prior statement to law enforcement and his "'To Whom It May Concern' letter" about whether the victims had a gun. And as to the latter, Drake's attorney confirmed that he would invoke "as to any questions" about "[h]ow that letter, the 'To Whom It May Concern' letter came about, and his writing it." In a response to Nolan's motion to continue the trial, Drake's attorney attached an email she had sent to Nolan and Drake's mother suggesting that the idea and contents of the letter did not originate with Drake. In the email, counsel wrote: "Apparently your husband contacted Drake to suggest that it could help [Nolan]'s case if Drake were to say that he saw a gun in the victim's hand right before [Nolan] and Connor shot. In other words, your husband is helping [Nolan] concoct a self-defense claim using Drake." Counsel stated that "any body can see it's a lie." Under these circumstances, we cannot say the trial court erred in denying Nolan's motion on this basis. *See Champagne*, 247 Ariz. 116, ¶ 78.

¶25        Nolan argues that Drake waived his right to invoke under the terms of his plea agreement. The plea agreement provided that, by accepting the agreement, Drake gave up the right to remain silent and refuse to be a witness against himself by asserting his privilege against self-incrimination. Nolan maintains this waiver applied to Drake being called as a witness at his trial. We disagree. In *Mitchell v. United States*, the Supreme Court rejected the government's argument that a guilty plea waives the privilege against compelled self-incrimination with respect to all the crimes comprehended in the plea. 526 U.S. 314, 321 (1999). In doing so, the Court distinguished a defendant's plea colloquy from a witness's testimony at trial. *Id.* at 321-23. "Unlike the defendant taking the stand, who cannot reasonably claim that the Fifth Amendment gives him . . . an immunity from cross-examination on the matters he has himself put in dispute, the defendant who pleads guilty puts nothing in dispute regarding the essentials of the offense." *Id.* at 322-23 (internal quotations and citations omitted). The waiver language in Drake's plea agreement did not expand the waiver to restrict Drake's Fifth Amendment right not to testify at Nolan's trial.

¶26        We further reject Nolan's argument that a plea "directly to the court" should be viewed differently than one made pursuant to a plea agreement. In either case, "[t]here is no convincing reason why the narrow inquiry at the plea colloquy should entail such an extensive waiver of the privilege." *Id.* at 322. In contrast, a witness who takes the stand and testifies that he did "some of it" must face cross-examination about all of it. *Id.* The trial court therefore did not abuse its discretion in denying Nolan's motion to preclude Drake from invoking his Fifth Amendment right not to testify at trial.

**Trial Court's Refusal to Order Grant of Immunity**

¶27        Nolan argues the trial court erred by refusing to order the state to grant Drake immunity for two reasons: (1) Nolan had no other means by which to present clearly exculpatory evidence, and (2) the state committed misconduct by substantially interfering with Drake's testimony. We review for an abuse of discretion a court's decision to deny "compulsory process [for] a witness claiming a privilege against self-incrimination." *State v. Mills*, 196 Ariz. 269, ¶ 31 (App. 1999).

¶28        Under Arizona law, the state has no obligation to grant immunity to a witness. *State v. Fisher*, 141 Ariz. 227, 243 (1984), *disapproved on other grounds by Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see also* A.R.S. § 13-4064 (prosecuting attorney initiates process by requesting order

compelling person to testify and granting immunity from use of such evidence). "It is a matter of prosecutorial discretion to decide when the public interest would be best served by a grant of immunity." *Verdugo*, 124 Ariz. at 94. And "there is nothing in the Fourteenth Amendment which gives a criminal defendant the right to have immunity granted to [a] witness" who asserts the privilege against self-incrimination. *State v. Buchanan*, 110 Ariz. 285, 289 (1974). The Sixth Amendment likewise places no obligation on the state "to secure testimony from a defense witness by replacing the protection of the self-incrimination privilege with a grant of use immunity." *State v. Jeffers*, 135 Ariz. 404, 424-25 (1983) (quoting *United States v. Turkish*, 623 F.2d 769, 774 (2d Cir. 1980)). Although a trial court may deny the state's request for a grant of immunity, § 13-4064, the court is not authorized "to grant immunity on its own motion." *Jeffers*, 135 Ariz. at 424.

**¶29** Nolan apparently recognizes that the trial court lacked the authority to grant immunity on its own, but he contends the court nevertheless erred by not ordering the state to do so. Nolan argues that the court can compel the state to grant immunity to a defense witness if the defense would otherwise be unable to present clearly exculpatory evidence and the state has no strong interest in refusing to grant immunity. The cases cited by Nolan for this proposition rely directly or indirectly on *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980).[5] *See Fisher*, 141 Ariz. at 243; *State v. Axley*, 132 Ariz. 383, 388 (1982); *State v. Doody*, 187 Ariz. 363, 376 (App. 1996). Nolan's reliance on that authority, directly or indirectly, is flawed.

**¶30** In *Smith*, the Third Circuit Court of Appeals held that even without evidence of prosecutorial misconduct, a court has "inherent authority" to immunize a potential defense witness when the witness is capable of providing "clearly exculpatory and essential" evidence to the

---

[5]We do not consider one of the cases cited by Nolan, *State v. Rogers*, No. 1 CA-CR 20-0497, ¶ 14 (Ariz. App. Mar. 10, 2022) (mem. decision), because it is a memorandum decision. Such decisions, issued after January 1, 2015, may only be cited for their persuasive value if "no opinion adequately addresses the issue before the court." Ariz. R. Sup. Ct. 111(c)(1). Nolan cites *Rogers* merely because it quotes language found in the other published opinions, which he cites. We also do not consider *State v. Wilson*, 237 Ariz. 296, ¶ 12 (2015), a Fourth Amendment case involving a search of the defendant's residence and thus having no application in this case.

defendant's case and when the state "has no strong interest in withholding use immunity." 615 F.2d at 974. However, the court later "abandon[ed] the judicial use immunity remedy created in *Smith*," recognizing that "[n]o statute or Supreme Court ruling authorizes judicial grants of immunity." *United States v. Quinn*, 728 F.3d 243, 247 (3d Cir. 2013). We recognize that *Quinn* did not abandon *Smith* entirely. The court retained *Smith*'s "five-part test for determining whether the Government's refusal to grant defense witness immunity denies a defendant due process" and thus constitutes prosecutorial misconduct. *Id.* at 247-48; *see also Smith*, 615 F.2d at 971-72 (detailing five-part test). The court noted that "*Smith* asks whether the Government has refused to immunize a witness in order to keep clearly exculpatory and essential testimony from trial without a strong countervailing reason. If so, this is a type of prosecutorial misconduct." *Quinn*, 728 F.3d at 248.

¶31        So, to the extent *Smith* created a basis for a grant of immunity, apart from prosecutorial misconduct, *Quinn* abandoned it. And even in the context of prosecutorial misconduct, the *Smith* test, retained by the court, also requires a showing that the state "has no strong interest in withholding use immunity."[6] *Smith*, 615 F.2d at 974. Since Drake had a right to challenge his sentence in the post-conviction relief proceeding pending during Nolan's trial, the state had a strong interest in withholding immunity. *See Axley*, 132 Ariz. at 388; *Rosas-Hernandez*, 202 Ariz. 212, ¶ 16. The trial court did not abuse its discretion by refusing to order the state to grant Drake immunity on this basis.

**Trial Court's Failure to Find Prosecutorial Misconduct**

¶32        Last, Nolan argues "the trial court erred by failing to order the State to grant [Drake] immunity given the State['s] misconduct." He claims the state interfered with Drake being called as a witness "in multiple ways": (1) the state suggested that the factual basis for Drake's plea differed from what he had told Nolan's investigator and that Drake could thus be in violation of his plea; (2) the state's suggestion was in violation of Drake's

---

[6]And even assuming Nolan could show a due process violation based on prosecutorial misconduct, the remedy would not involve a trial court order requiring the state to grant Drake immunity for his testimony. "[T]he remedy for a due process violation, rather than intruding into the prosecutor's province by judicial grants of immunity, is a retrial where the Government can cure the distortion caused by its wrongdoing or face dismissal of the relevant charges." *Quinn*, 728 F.3d at 248.

plea, which "expressly prohibited [him] from invoking the Fifth Amendment respecting issues in this case";[7] and, (3) the state "significantly delayed resolution" of Drake's post-conviction relief proceeding without "any sound reason."

**¶33**        "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Morris*, 215 Ariz. 324, ¶ 46 (2007) (quoting *State v. Hughes*, 193 Ariz. 72, ¶ 26 (1998), *disapproved on other grounds by State v. Escalante-Orozco*, 241 Ariz. 254 (2017)). Obtaining relief for a claim of prosecutorial misconduct does not require proof of a prosecutor's intent. *State v. Romero*, 262 Ariz. 141, ¶ 20 (2026). "It is well established that substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." *State v. Sanchez-Equihua*, 235 Ariz. 54, ¶ 8 (App. 2014) (quoting *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005)). "Equally well established, however, is that perjury warnings are not improper *per se* and that 'the Sixth Amendment is not implicated every time a prosecutor or trial court offers advice regarding the penalties of perjury.'" *United States v. Vavages*, 151 F.3d 1185, 1189 (9th Cir. 1998) (quoting *United States v. Davis*, 974 F.2d 182, 187 (D.C. Cir. 1992)). And "there is no violation of the right to compulsory process when the unavailability of the witness has not resulted from the suggestion, procurement, or negligence of the government." *State v. Stewart*, 131 Ariz. 407, 410 (App. 1982).

**¶34**        Here, the record does not support Nolan's claim about the state's involvement in Drake's decision to invoke his Fifth Amendment right not to testify. After Drake was sentenced and had filed his notice for post-conviction relief, Nolan's investigator interviewed him about the "To Whom It May Concern" letter. At the time, Drake was represented by counsel, who had not been informed that the interview had occurred. After the interview, Nolan gave notice that he would be calling Drake as a trial witness. The prosecutor then contacted Drake's attorney for permission to interview Drake and forwarded the interview transcript and audio recording to Drake's attorney. The prosecutor and Drake's attorney subsequently had a conversation about whether the factual basis for Drake's plea differed from his statement to Nolan's investigator. The prosecutor "suggested that the statement Drake made to the private

---

[7]We have already decided this issue above.

investigator was or may be false and asked whether the statement violated the factual basis that Drake agreed to at the time of the change of plea in his case."

¶35 At the first hearing on his motion to dismiss or preclude Drake from invoking, Nolan claimed the prosecutor's statement that Drake "may be in violation of his plea agreement by mentioning self-defense" and expressing, "in his opinion, that what [Drake is] saying about self-defense is false," raised an issue of prosecutorial misconduct. Nolan argued that "but for the fact of . . . the prosecutor's statement," Drake's attorney would not have advised Drake to "invoke the Fifth." According to Nolan, the prosecutor "gave his opinion . . . that Drake Nolan is lying, to such an extent, that . . . [Drake's attorney] went and told the mother in a letter that [Drake]'s facing perjury charges."

¶36 In its response to Nolan's motion, the state countered that it had an ethical duty to contact Drake's attorney "regarding the fact that he was listed as a witness, had given an interview, and would be subject to another interview by the State." And in her affidavit, attached to the state's response, Drake's attorney stated that "[a]t no point has [the prosecutor] ever said or otherwise suggested to me that I should get my client to invoke his rights under the Fifth Amendment." She also stated that the email she sent to Nolan's and Drake's mother "where I suggested that [Drake] could be prosecuted by the state for perjury was based on my own professional opinion, not because [the prosecutor] . . . said that Drake would be prosecuted for perjury." She continued: "I read [Drake's] statement to the police and reached a professional assessment, based on over 30 years of experience as a criminal defense attorney, that [Drake's] statement to the private investigator was likely false."

¶37 The trial court made several findings at the conclusion of the hearing. First, it stated there was "nothing improper" about the state telling Drake's attorney that Nolan's "investigator had been talking to Drake directly, even though he's represented." Second, the court asserted that it was "entirely reasonable for [Drake's attorney] to advise him to assert the Fifth." Her decision was "not because of anything the State did, it's because she, in her own independent judgment, has decided that it's not in his interest to waive his Fifth Amendment right." When the court asked Nolan's attorney what evidence he had that the prosecutor had made a specific threat, or that there was a dispute about what the prosecutor and Drake's attorney said, Nolan's attorney responded, "That's why we need [the prosecutor and Drake's attorney] on the stand under oath." The court

then told Nolan's attorney that he was "just speculating." The court concluded that there was no improper conduct by the state "that would prevent Drake from claiming the Fifth [n]or [was] there . . . any improper conduct that would cause the Court to dismiss the case on prosecutorial misconduct" grounds. The record supports the court's ruling.

¶38 Nolan argues "the record indicates the primary reason Drake opted to invoke was the pendency of his post-conviction relief matter; however, the State significantly delayed resolution of that matter." He maintains "[t]he issue raised was incredibly simple" and the state's request for an extension to file its response "more than three weeks before the deadline strongly suggests 'administrative burden' was not the issue." We have already rejected Nolan's opinion regarding the merits of Drake's post-conviction proceeding above. And contrary to Nolan's argument, although the state did request an extension "[d]ue to administrative burdens," it requested a filing date of December 20, 2024. That date preceded the first day of trial on January 14, 2025, as well as Nolan's first defense witness who was called on January 29, the tenth day. The state's request for an extension did not interfere with Nolan's ability to call Drake as a witness. The trial court therefore did not err by denying Nolan's motion to dismiss on prosecutorial misconduct grounds.

## Disposition

¶39 For the foregoing reasons, we affirm Nolan's convictions and sentences.